*The probate of the paper propounded as the Will of* WILLIAM H. MERCHANT.

THE material testimony of a witness who has not been impeached as to general character, and who has been contradicted only as to particulars of his testimony, ought not to be discredited.

It is not necessary that a testator should have touched the paper of the will with his own hand, or with the point of his pen, if the subscription of his name thereto be adopted by his acknowledgment and declaration.

The evidence only of such witnesses as are acquainted with the handwriting of the decedent can be received, as to whether the paper propounded, or its subscription, are in decedent's handwriting.

Witnesses may be examined as to the general handwriting and subscription of a former will, already admitted to probate, and made an exhibit (in a proceeding to prove a testamentary paper of later date), and may compare such handwriting and subscription with those of the paper propounded, and testify, as to their judgment, therefrom.

Other papers, not in the case, cannot be compared by the witnesses.

Comparison being a question of fact, the evidence of experts not acquainted with the handwriting of the decedent, is not competent.

The Surrogate will make the comparison, with the aid only of witnesses so acquainted with the handwriting.

Photographs of last wills and testaments, not admitted as evidence.

In proceedings to prove an alleged later will and to revoke probate of one already admitted to probate, allegations need not be filed within one year, under the statute.

L. S. CHATFIELD, S. P. RUSSEL *and* D. C. BIRDSALL, *for proponents.* PIERREPONT & STANLEY, *and* S. L. HULL, *for contestants.*

THE following petition, duly verified, was presented to the Surrogate:

*To the Surrogate of the county of New York:*

The petition of Jesse H. Cunningham, and Selina A., his wife, of the city of Brooklyn, respectfully shows, that on the 12th day of March, 1861, one William H. Merchant, then of the said city of New York, departed this life, leaving both real and personal property to a large amount, and leaving the said Selina A. Cunningham and Mary E. Pratt, wife of James H. Pratt, his sisters, and only heirs-at-law and next of kin him surviving; that said James H. and Mary E. Pratt reside in the city of Brooklyn, and that both the said Selina and Mary E. resided in Brooklyn aforesaid, at the time of the death of the said Merchant; and your petitioners further show that soon after the death of the said Merchant, a will was discovered, which purported to be the last will and testament of said Merchant, bearing date the 27th day of September, 1859, and wherein and whereby one Charlotte A. Souza and one Minna S. Greensward were made the sole legatees and devisees of said Merchant, and the said Charlotte A. Souza was therein made and appointed the sole executrix of said last will and testament. That your petitioners then believed that the said will was not the last will and testament of said Merchant, but that said Merchant had, in fact, made and published a last will and testament of a later date than the said will above men-

tioned, and that he had therein revoked the said last will and testament above mentioned.

And your petitioners further show, that the said last will and testament above mentioned was, on the 20th day of March, 1861, by the said Charlotte A. Souza, propounded to the Surrogate of the city and county of New York, for probate; that citations to your petitioner, the said Selina, and to the said Mary E. Pratt, as the next of kin of said Merchant, were duly issued by said Surrogate, and served on said Selina and Mary E. in due form of law; and that the said Selina and Mary E. appeared before said Surrogate on the return day of said citations, and contested the proof of said will, and the admission thereof to probate by said Surrogate; and that such proceedings thereon were had, that, afterwards, to wit: on the 26th day of June, 1861, the said last will and testament was admitted to probate by said Surrogate, as a will duly proved, and as the last will and testament of said William H. Merchant; but, because the said Charlotte A. Souza, the executrix named in the said will, was an infant within the age of twenty-one years, and therefore incapable of administering upon said estate, William Stanley, Esq., was, on the 14th of January, 1862, appointed administrator of said estate, with the said will annexed, and letters testamentary, with said will annexed, were thereupon issued to said Stanley by said Surrogate.

And your petitioners further show that the said last mentioned will and testament was not the last will and testament of the said William H. Merchant; but that, after the proofs relating thereto had been closed, and after said Surrogate had decided and determined to admit said will to probate, to wit: in the month of February, 1862, the true and only last will and testament of said William H. Merchant was discovered; wherein and whereby the said William H. Merchant gave, devised, and bequeathed all his estate and property to the said Selina A. Cunningham and Mary E. Pratt; and therein

nominated and appointed the said Selina A. Cunningham sole executrix thereof, and therein revoked and annulled all former wills by him made. And your petitioners say that the said last mentioned will was, on the 13th day of February last past, duly propounded by them to the Surrogate of said county of New York for probate, and they prayed that the same might be admitted to probate.

And your petitioners further say, that the said last mentioned will and testament is a good and valid will, and was in due form of law made and executed by said William H. Merchant, as and for his last will and testament; and was by him, at the time of the making and execution thereof, duly declared by him to be his last will and testament; and they say that the last will and testament so made in favor of said Souza and Greensward, and admitted to probate as aforesaid, is not the last will and testament of said Merchant; but that the same has been in all things canceled and revoked.

Your petitioners therefore pray, that the said last will and testament of said Merchant, bearing date the 12th day of March, 1861, and propounded for probate by your petitioners, may be admitted to probate, and may be duly proved by and before the said Surrogate as the last will and testament of said Merchant, and that letters testamentary thereon may be issued to said Selina A. Cunningham as executrix thereof; and that probate of the said will and testament, bearing date 27th September, 1859, and heretofore proved and admitted to probate as aforesaid, may be canceled, revoked, and declared void; and the said letters testamentary, or of administration, so issued to said Stanley as aforesaid, may be canceled, revoked and set aside, to the issue that the said estate may be duly administered by the said Selina, as executrix of the last will and testament of said Merchant, and in accordance therewith: and as in duty bound, &c.

To this petition the following answer was made and filed:

William Stanley, administrator of the estate of William H. Merchant, deceased, and guardian of Charlotte Ann Souza, answers the petition of Jesse H. Cunningham and Selina A. Cunningham, his wife, as follows: .

1st. For a first defense, the respondent denies each allegation in the petition contained.

2d. And for a second defense, the respondent alleges that the Surrogate of the county of New York has no jurisdiction to revoke the probate of the said will, bearing date the 28th day of September, 1859, and which was admitted to probate on the 28th day of June, 1861: inasmuch as the petition herein containing the allegations in writing against the validity of said will, was not filed in the office of the Surrogate, by whom the said will was proved, within one year after the said will was proved; but the petition herein, containing allegations against its validity, was filed after more than one year had elapsed since the probate of said will, to wit: on the 6th day of November, 1862.

3d. And for a third defense, the respondent alleges that the said will, bearing date the 28th day of September, 1859, was duly executed by the said William H. Merchant; and a decree of the Surrogate of the county of New York entered, admitting the same to probate, on the 26th day of June, 1861; its execution having been contested by the said Selina A. Cunningham and Mary A. Pratt, the heirs-at-law and next of kin of said testator ; and, thereafter, and on or about the 6th day of July, 1861, the said contestants perfected an appeal from the said decree of said Surrogate, to the Supreme Court. of the State of New York; and, after hearing counsel for the said respondents and said contestants, upon said appeal, said decree of said Surrogate was, on or about the 28th day of December, 1861, in all respects affirmed; whereupon said decree of said Surrogate became the decree of the Supreme Court, to the effect that the said will was the last will and testament of the said William H. Merchant; and the said Surrogate has.

no power or authority to revoke, alter, or modify said decree; that afterwards, and on or about the 17th day of January, 1862, the said Mary A. Pratt and Selina A. Cunningham appealed to the Court of Appeals from said decree of the Supreme Court; and afterwards, and on or about the 10th day of September, 1863, the said last mentioned appeal was dismissed by the Court of Appeals.

4th. And for a fourth defense, the respondent alleges that the said William H. Merchant never signed, acknowledged, or ever saw or executed the paper referred to in said petition, as bearing date the 12th day of March, 1861, but that the same was and is a forgery.

Wherefore, the respondent prays that the petition and proceedings herein may be dismissed, with costs.

Minna S. Greensward, legatee under the former will, made and filed a similar answer.

The following is the paper offered for probate by Mrs. Selina A. Cunningham, sister of the deceased :

Know all men by these presents : That I, William H. Merchant, of the city of New York, gentleman, considering the uncertainty of this life, and being of sound mind, memory and understanding, do make, publish and declare this my last will and testament.   First. After all my just debts are paid, I hereby give, grant, devise and bequeath all the property to me now belonging, or that to me may belong at the time of my decease, both real and personal, of whatever kind it may be, or wheresoever situated, to my two sisters, namely, Mary Eliza Pratt, formerly Mary Eliza Merchant, and Selina Amanda Cunningham, formerly Selina Amanda Merchant, both of the city of Brooklyn, to be equally divided between them, in their own right forever, and not subject to the control of their husbands.

Secondly. I hereby nominate, constitute and appoint my dear sister Selina Amanda Cunningham, wife of Jesse H. Cunningham, sole executrix of this my last will and

testament; and I hereby revoke all other and former wills by me at any former time made.

In testimony whereof, I have hereunto set my hand and seal, this the eleventh day of March, in the year of our Lord one thousand eight hundred and sixty-one.

WILLIAM H. MERCHANT. [L. S.]

Signed, sealed, declared and published by the said William H. Merchant, as and for his last will and testament, in presence of us, who, at his request and in his presence, and in the presence of each other, have subscribed our names as witnesses hereto.

JNO. L. HARLEY, 468 Hudson St.
J. T. BROWN, 118 Varick St.

Before these petitions and answers were presented, the following decrees had been made and entered, establishing as a will a testamentary paper of earlier date:

At a Surrogate's Court, held in and for the county of New York, at the Surrogate's office, in the city of New York, on the 27th day of June, in the year 1861.

Present—EDWARD C. WEST, ESQ., *Surrogate.*

IN THE MATTER OF PROVING THE LAST WILL AND TESTAMENT OF WILLIAM H. MERCHANT, DECEASED.

The citation in this matter having been duly issued, served, and returned, and the said matter having been contested, such proceedings were thereupon had, that the proofs were duly taken, and the allegations of the parties appearing having been heard, it is decided, ordered, adjudged, and decreed, that the instrument offered for probate in this matter, is the last will and testament of the testator, and as such, is valid as a will of real and personal estate. And it is further ordered, adjudged, and decreed, that the costs and counsel fees in this matter be paid out of the estate, and to be hereafter certified by the Surrogate.

THE PROBATE OF THE WILL OF WILLIAM H. MERCHANT.

> At a General Term of the Supreme Court, held at the City Hall, in the city of New York, on the 28th day of December, 1861.
>
> Present—The Hon. Justices CLERKE, ALLEN and SUTHERLAND.

IN THE MATTER OF THE PROBATE OF THE
LAST WILL AND TESTAMENT OF WILLIAM
H. MERCHANT, DECEASED.

This cause coming on to be heard in the regular order on the calendar, on the appeal of Jesse H. Cunningham, Selina A. Cunningham, James H. Pratt and Mary E. Pratt, from the decree of the Surrogate of the county of New York, dated the 27th day of June, 1861, admitting the said will to probate; after hearing Alexander W. Bradford, for the appellants, and Edwards Pierrepont for the respondent Charlotte Ann Souza, and Solomon L. Hull for the respondent, Minna S. Greensward; it is ordered that the said decree appealed from be in all respects affirmed, with costs, to each of said respondents, to be paid by said appellants, to be taxed by the Clerk of this Court.

And it is further ordered that all proceedings herein be remitted to the Surrogate of the county of New York, and that he proceed herein according to law.

> At a Court of Appeals, for the State of New York, held at the Capitol, in the city of Albany on the 10th day of September, A. D. 1862.
>
> Present—Hon. HIRAM DENIO, *Chief Justice, presiding.*

JESSE H. CUNNINGHAM ET AL.
*against*
CHARLOTTE ANN SOUZA ET AL.

·· On reading and filing due proof that the appeal to this Court in this action was perfected on the 17th day of

January, 1862, and that, afterwards, notice in writing, requiring the return therein to be filed with the Clerk of this Court within ten days, was duly served on the appellant's attorney, pursuant to the provisions of rule second of this Court; and it appearing by the certificate of said Clerk that no return has been filed, as required by said notice: Now, on motion of Messrs. Pierrepont, Stanley, and Langdell, attorneys for the respondent Souza, it is hereby ordered, that the appeal aforesaid be and the same hereby is dismissed with costs, for want of prosecution.

The following was the earlier will which had thus been admitted to probate:

In the name of God: Amen. I, William H. Merchant, of the city of New York, gentleman, being of sound and disposing mind and memory, and desirous of setting my worldly affairs in order while I have strength and capacity so to do, do make and publish this my last will and testament in manner and following, that is to say:

First. I direct my executrix, herein named, to pay my funeral expenses, and my just debts, if any there shall be.

Second. I give unto Minna Skelton Greensward, a very dear friend, formerly of the island of Jamaica, West Indies, and at this time, I believe, residing at No. 139 Sixteenth street, New York, the sum of $20,000 in cash, to be paid to her, with interest at the rate of seven per cent, from the day of my death, on the settlement of my estate, or as soon as may be after my decease, as my executors may deem best.

Third. All the rest, residue, and remainder of my estate, real and personal, whatsoever and wheresoever the same may be, I give and bequeath unto Charlotte Ann Souza, daughter, I believe, of Theodore and Elizabeth Souza, and now residing at No. 603 Eighth avenue, a young lady to whom I am under engagement of marriage, for her own sole use and benefit, absolutely and forever.

Fourth. I do hereby constitute and appoint Charlotte Ann Souza, aforesaid, sole executrix of this my last will and testament; and I do hereby authorize her to adjust and settle, compromise and compound all or any debts due to me, whenever it shall be expedient to do so. . In witness whereof, I have hereunto set my hand and seal, this 27th day of September, in the year of our Lord one thousand eight hundred and fifty-nine.

W. H. MERCHANT. [L. S.]

Signed, sealed, published, acknowledged, and declared by the above named testator, as and for his last will and testament, in our presence, who, at his request, and in his presence, and in presence of each other, have herewith set our names as subscribing witnesses.

WILLIAM F. T. CHAPMAN,
189 Spring street.
DAVID MAHANY,
91 Madison street.

THE SURROGATE. William H. Merchant died suddenly on the 12th day of March, 1861. . A paper executed by him on the 27th day of September, 1859, was admitted to probate by the Surrogate of New York, and the probate was affirmed, on appeal, by the Supreme Court and Court of Appeals. . By this instrument a legacy of $2,000 was left to Miss Minna S. Greensward, and the whole rest, residue and remainder of his estate was left to Miss Charlotte Ann Souza, "to whom," says the testator, "I am under engagement of marriage."

The present proceeding brings forward an alleged testamentary paper of later date, namely, March 11, 1861, the day before the death of the decedent, and prays that it be admitted to probate, and that the probate of the first will be revoked. This alleged last will bequeaths the entire estate of the decedent "to my two sisters, Mary Elizabeth Pratt and Selina A. Cunningham," who were his heirs-at-law and next of kin. . The contestants in this

proceeding, the two ladies in possession of the estate under the first will, set up that this document is a forgery, concocted since Merchant's death.

The two attesting witnesses to the paper now offered for probate, swear to its execution by the decedent, and if their testimony is to be relied upon, I have no option but to decide for its probate. I cannot say that it has been materially shaken. Neither of them has been impeached as to general character, and the particulars in which they seem to be contradicted (as to the weather on the 11th of March, &c.), do not, in my judgment, authorize me to discredit their material testimony. While, therefore, I confess to have at first entered upon the consideration of this case under the influence of doubts, suggested by the peculiarity of the date, and the unusual circumstances of the execution of this paper, I must say that, upon a full consideration of the evidence, that in favor of the execution of this paper by the decedent predominates.

It will be necessary to quote a portion of the testimony.

Richard A. Reading, called by proponents, testified:

Q. Have you ever seen this will before (the paper now propounded)? A. I have seen this will before.

Q. Will you state to the Surrogate when you first saw it, and the circumstances attending the finding of it? A. I first saw that will in February, 1862; the day of the month I cannot tell. As to the circumstances—I think, on the first day of February, 1862,—I think that was the date, I received a note from a man of the name of ——

Q. Is the paper you hold in your hand the paper you received? A. Yes, sir, it is the note or letter referred to. (Paper put in evidence.)

Q. In consequence of the receipt of that letter, what did you do? A. Well, it was some days, may be upwards of a week, after I received that letter, that I called at the place there referred to, to see this Mr. Clarke; I did not know him; I think I called there three times before I

saw him, and then found him in; I asked him if that note was from him.

Q. Did you ascertain from him that he wrote the note? A. I did.

Q. Did he show you anything upon either of these occasions? A. He showed me some papers in his office; he did not volunteer to tell me anything about a box.

Q. Did you ascertain from him that he had a box in his possession? A. I did.

Q. Did he show you the box? A. Not at that interview; he told me he had a box there of Mr. Merchant's; I did not see the box there.

Q. What did you do then? A. I went to see Mr. Cunningham, brother-in-law of Merchant, and told him I had ascertained, in the very manner I tell here, that there was a tin box belonging to Mr. Merchant, at the office of a Mr. Clarke, in Chambers street.

Q. (By counsel for contestant.) At this time you had not seen the box? A. No, sir, Mr. Cunningham and I went then to see Mr. Chatfield, and we three went over to Clarke's; that, however, was also at my suggestion; we went over there to Mr. Clarke's office, and asked him to show us the box; he did so; he brought out the box wrapped in a piece of newspaper, and opened the newspaper and showed us the box, and said the box belonged to Mr. Merchant.

Q. What was then done? A. I took the box and carried it; we went to the office of Herring, in Broadway, and one of his men there picked the lock, at our request; I then carried the box to Mr. Chatfield's office.

Q. Without opening it? A. Without opening it—in Broadway—and I there opened the box, lifted the lid, the lock being picked before.

Q. In the presence of whom? A. In the presence of Mr. Chatfield and Mr. Cunningham; I don't know whether anybody else was in the room or not. (Box produced.)

THE PROBATE OF THE WILL OF WILLIAM H. MERCHANT.

Q. Is that the box? A. I have no doubt that it is the box, sir.

Q. After opening the box, what did you do? A. I took out, one by one, the contents of the box, and examined them, what they were, and took a note of them.

Q. Made a note of the contents of the box? A. I did.

Q. Have you got that? (Paper produced by witness.) Is that a full and accurate note of all that was in the box? A. It is every item that was in the box, with the number of it; I think I put a number on the different papers; they were numbered as I took them out. (Paper put in evidence.)

Q. Among the papers did you find any will? A. I found a paper purporting to be a will of William H. Merchant.

Q. In what part of the box did you find the will, this paper? A. I think I found it within a book; yes, sir, within the leaves of a book, the title of which was "Wells' Lawyer and United States Form Book."

Q. Do you remember whether it was in the page of the book containing the form of a will? A. I do not.

Q. After finding this paper, purporting to be a will, and taking a note of the contents of the box, what was done then? A. I carried the will away with me; I would say before that, I read the will in the presence of those two gentlemen; I took it away with me.

Q. You made a copy of it? A. I made a copy of it.

Q. How long did you retain possession of it before you carried it here? A. I can't tell; some two weeks, perhaps; at all events, I retained possession of it till I brought it to the Surrogate's office, some two weeks after; it was not out of my possession all the time.

Q. You delivered it to the Surrogate? A. Yes, sir.

Q. (The paper being shown to witness.) Is that the paper you found in the box? A. It is; this is the paper. (Box, with contents, put in evidence.)

John L. Harley, called on behalf of proponents, testified:

My name is John L. Harley, sixty-two years of age, and my residence is 127 Leroy street.

Q. Did you know William H. Merchant, in his lifetime? A. I did, sir.

Q. How intimately? A. He was a landlord of mine. I knew him from that connection, and also from having been a co-defendant with him in a suit.

Q. So that you knew him? A. Yes, sir. (Paper propounded is handed to witness.)

Q. Will you look at that will and say whether you are a subscribing witness to it? A. Yes, sir.

Q. Will you state all of the circumstances connected with the signing of the will of William H. Merchant? A. I met Mr. Merchant, in front of Lovejoy's Hotel, in Park Row, on the day of the execution of that will; I had been in the hotel and came out, and was standing at the door on the steps; Mr. Merchant was coming from Park Row, from the direction of Chatham street or Centre street; seeing me at the steps, he accosted me, "How do you do, Harley?" or words to that effect; at that moment an old friend of mine, Mr. Brown, was coming up Park Row, around from the Astor House or Fulton street, coming in the opposite direction from which Merchant was coming, and I hailed him and wanted to see him; while Mr. Merchant and I were talking, I asked him to stop for a few moments; in the meantime he stepped one side, and Merchant and I had a little conversation; he said that I could save him the trouble of going down to Wall street; we then went inside of Lovejoy's Hotel.

Q. Who went inside? A. Mr. Merchant, Mr. John T. Brown, and myself; he then told me that he wished me to witness an instrument which he had, and requested me to ask my friend to witness it also; he then led the way into the reading room, took a paper out of his inside frock coat.

Q. What pocket? A. Breast pocket, inside, and sat down at the table, and opened the instrument; he then said, "I wish you and your friend to witness this document; it is my will;" he requested me to sign it, and I did so; he then asked Mr. Brown to sign it, and I got up and gave him the chair I was sitting on, and he sat down and I also saw him sign it.

Q. What occurred after you had signed it? A. He took a piece of newspaper and blotted it, and folded it up, and put it in the same pocket again.

Q. State what further occurred? A. We went out into the hall; I asked him if he was going to get married, or what was the matter, or whether he was going to die; this was after the signing of the will; I asked him how he had been, &c. Says I, "You look rather unwell;" he was very nervous; he looked ill, more pale than he generally looked; he said he felt very unwell, complained of a burning sensation at the heart or stomach; he invited Brown and I to go and take a drink, which we declined, and I went out as far as the door with him where we met, and he retraced his steps up towards Chatham street, and I never saw him afterwards.

Q. Was the will executed at that time, or did he sign it in your presence. A. It was not signed in my presence; it was signed previously.

Q. Did he say anything as to whether that was his signature or not? A. Yes, sir; he said, "That is my signature;" he looked at it and looked at Brown, and put his finger on it, and acknowledged it to be his signature.

Q. Was that before or after you signed it? A. It was before we signed it.

Q. What did he ask you to witness? A. He said that was his last will and testament, and he declared it to be so to us.

Q. Was it before or after you signed, that he declared it to be his last will and testament? A. That was before we signed it.

Q. Do you remember whether it was upon the day the will bears date or not? A. (Witness examined the will.) The 11th day of March, it says here; it was about that time; I cannot swear positively to the date.

Q. Had he anything with him at that time? A. Yes, sir, he had a tin box, that he usually carried, with his insurance papers and public documents. (Tin box produced.)

Q. Can you say whether this is the box, or not? A. I cannot swear that that was the box; it was a box like that, and about that size.

Q. As to size and appearance, it was the same? A. Yes, sir; I could not swear to the box.

Q. That was the last you ever saw of Mr. Merchant? A. That was the last I ever saw of him.

Q. Did you hear of his death? A. Yes, sir; I believe Mr. Reading was the first gentleman who informed me of his death.

Q. State about how long it was after you witnessed the will? A. I think it was some time in the month of February, of last year, 1862.

Q. Did he take the box away with him when he went away? A. Yes, sir.

John T. Brown, called as a witness for proponents, testified as follows:

Q. Will you state your age, name and place of residence? A. John T. Brown, forty-four years of age, 118 Varick street.

Q. Where did you reside on the 11th of March, 1861? A. Same place.

Q. Will you look at that will there; did you sign that paper as a witness? A. I did.

Q. At what place? A. It was at Lovejoy's Hotel.

Q. On what day? A. I cannot tell the day; whether it was about the date there, 11th March, 1861, I don't know, whether it was on that day or not.

Q. Will you state the circumstances attending the

execution of that paper? A. I was going up Park Row, and as I got near Lovejoy's Hotel I saw Mr. Harley, and he beckoned to me, as if he wanted to speak to me; he said he wanted me to come in; he said he wanted to see me; said he wanted me to sign a paper with him. We went into another room, it might have been the reading room, where there was a table, and I was introduced to this gentleman as Mr. Merchant, a friend of Mr. Harley's. He wanted me to sign a will; he said it was his last will and testament. Mr. Harley signed it, and then I subscribed my name.

Q. Did Mr. Merchant ask you to sign it as a witness? A. Mr. Harley did, first; Mr. Merchant did, in there; that is, a person that was introduced to me as Mr. Merchant.

Q. Was the will signed by him there, or was it signed when he produced it? A. It was signed when I saw it.

Q. What did he say, if anything, about the signature? A. He said that was his signature, and it was his last will and testament.

Q. Were you all three together when you both signed in the presence of each other? A. Yes, sir.

As a question of law, I am here called upon to rule, that, even though the signature to the paper propounded, were not written with Merchant's own hand, it was competent for him, under the statute, to have made it his, and to have "subscribed" the document, in contemplation of law, by acknowledging his name written there by another person. The testator need not have touched the paper with his own hand, or with the point of his own pen, if the subscription of his name thereto be adopted by his acknowledgment and declaration.

The question of forgery is one of the most difficult and delicate issues which can come before a tribunal of law. It is one which ought never to be tried before a single judge. It is essentially a question for a jury, and I have unsuccessfully endeavored for years to get the Legislature

to allow the summoning of jurors in Surrogate's Courts, or the sending of feigned issues by Surrogates to Courts of Law, for the decision of such questions as this. The question of forgery has now, however, to be passed upon by the Surrogate. The Revised Statutes require that before recording any will, the Surrogate shall be satisfied of its genuineness and validity. He is of course to be satisfied by legal proofs. Evidence at great length on both sides has been taken as to the handwriting of the paper propounded as the last will. This I permitted; for although I considered that Merchant might have made a valid will without writing or signing it with his own hand, yet the probability whether he, an active, self-reliant and economical business man, would be likely to have it made for him, and above all signed for him, by another person, was also to be considered in deciding on its genuineness and validity.

Evidence as to handwriting is likely to be either wholly conclusive or else extremely perplexing and well balanced. In this case, I can scarcely say whether the weight of the evidence is for or against the probability that the paper propounded is in the handwriting of the deceased man. The majority of the witnesses, in number, swear that it certainly is not Merchant's handwriting or Merchant's signature. The minority in number, who swear that it certainly is his handwriting and his signature, are however more familiar with his hand, and familiar for the longest periods of time. If the handwriting of the body and signatures of this paper be a forgery, it is one which has deceived some of those who were the best acquainted with his hand.

Upon this point, the witnesses contradicted each other in a remarkable manner.

Edward A. Stansbury, called for contestants, testified:

Q. Will you please state your occupation? A. My present occupation is that of Secretary of the Metropolitan Insurance Company, 108 Broadway.

Q. How long have you been in that employment? A. For nine years.

Q. Prior to that, what was your occupation? A. I was for about a year and a half a broker in Wall street; before that I resided in the State of Vermont; I was a member of the bar first, and clerk of the Court for several years, and afterwards an editor of a paper; I have had a variety of Yankee occupations.

Q. Tell the Court the opportunities you have had for being familiar with handwritings? A. My occupation, I suppose, will suggest the opportunities I have had; I, however, had a tact for reading and imitating handwriting; I have been rather famous among people who know me, for imitating handwriting, and have been called upon as an expert in examining handwriting.

Q. For how many years have you been in the habit of being called upon as an expert in examining handwriting? A. I think about twenty years.

Q. Will you tell the Court the extent, somewhat, of your experience in the examination of handwriting?

[Proponent's counsel objects to proving anything by experts, as experts; that it is entirely inadmissible in this State, and that there are no experts in handwriting.]

Q. State the facts that show your familiarity with handwriting generally?

[Objected to; objection overruled.]

A. Well, sir, you ask me to state the facts which go to show my familiarity with handwriting; I can only say that I have always been in the habit of scrutinizing handwriting with very great care, and have long been able to decipher manuscripts which other people could not; I have been in the habit of examining great numbers of autographs; I should think I have not been called more than a dozen times on the stand as a witness, perhaps not as many as that.

Q. I speak of experience aside from the stand? A. I can only give you what I mention; that is, that I have a

great many times deciphered manuscripts that nobody else could decipher, and I have often remarked that I should have a place in the post office to read the unreadable directions.

Q. You have had the experience of how many years? A. I first began to have a tact for examining handwritings about thirty years ago, in the office of Judge Oliver, in Geneva, the Supreme Court Clerk. I was afterwards in the office of Charles Butler, in Geneva.

Q. Will you now state the opportunities you have had of examining the handwriting of William H. Merchant, deceased? A. He was a stockholder in the company I am in; I have never had any, except seeing him receipt for dividends; he gave his receipt on the dividend book.

Q. Should you know his handwriting if you saw it? A. Oh, I would have no difficulty; I have had my attention called to his handwriting within a year or two, and have examined his handwriting.

Q. Will you look at that? (Hands will propounded to witness.)

[Proponent's counsel objects to their giving any evidence of the handwriting, at all, for the reason that the will has been hawked about the city by the counsel on the other side, and thereby defaced and torn. Also, that evidence of handwriting is not admissible in a case of this kind. Also, that it is not competent for them to show the opinion of anybody in relation to the will or signature; that it can't be anything but an opinion. Objection overruled. Exception.]

Q. Will you look at this paper here handed you, purporting to be a will of William H. Merchant, deceased, and now offered for probate; examine both the body of it and the signature to it, and state whether any of it is, or is not, in the handwriting of the said William H. Merchant? A. I have examined the will formerly as well as now, before this, as well as to-day, and I have but one

conviction on the subject, and that is, that it is not in the handwriting of William H. Merchant, or any part of it.

Stephen S. Merchant, called as a witness by contestant, testified:

Q. Will you please state your occupation, and where you live? A. Shipping and commission merchant; 88 Wall street.

Q. Do you know the handwriting of William H. Merchant, deceased? A. I don't know that I do, sir.

Q. Have you seen him write? A. I have seen him write.

· Q. In his lifetime? A. Yes, sir, that is, if my memory serves me.

Q. Where? A. While I was Secretary to the Pacific Mail Company.

Q. What relation had he to it? A. He owned some of the stock, and used to come in and collect the dividends.

Q. Do you know his signature? A. As he signed it, as I have seen it.

Q. Have you seen him sign it at your office? A. I have, sir, as a receipt for the dividends on the stock of the Pacific Mail Company.

Q. Look at this paper (propounded . will), and state whether that signature is the signature of the late William H. Merchant?

[Objected to, that he has not shown a sufficient knowledge of his handwriting to allow him to speak as to this signature.]

*Witness*—I hope you will bear in mind that I am no relation to the deceased.

[Objection overruled. ˙ Exception.]

A. I should say not, sir.

John Stevens, called as a witness for contestants, testified:

Q. Please state whether you were acquainted with Mr. William H. Merchant, in his lifetime? A. I was, sir.

Q. State your relations to him? A. I was a tenant of his.

Q. For how long? A. I think about ten or eleven months; I am not positive.

Q. What is your business? A. Dry goods.

Q. Where is your store? A. 599 Eighth avenue.

Q. You knew Mr. Merchant? A. Yes, sir.

Q. Did you ever see him write? A. Yes, sir.

Q. Do you know his signature? A. Yes, sir.

Q. Do you know his handwriting? A. I know, as far as his receipts are concerned.

Q. You have seen him write? A. Yes, sir.

Q. Look upon this paper (propounded will), and state as to the signature and body, your belief as to its being the handwriting of William H. Merchant, deceased? A. I don't think it is, sir.

Q. Either? A. No, sir.

*Cross-examined.*

Q. When and where did you see him write? A. At my store, write receipts; I can't tell you the date, but I think it was in 1858 or 1859; I could not tell without referring to my receipt book.

Q. Did he write the body of the receipt as well as the signature? A. Yes, sir; he wrote the whole of the receipt.

Q. Have you any of those receipts? A. I have not them with me; but I have them.

Q. How many receipts did you take? A. I cannot tell without referring.

Q. As a matter of memory do you remember more than one? A. Yes, sir.

Q. How many do you remember? A. Half a dozen.

Q. Do you remember of six? A. I remember his giving six receipts.

Q. Did you see him write? A. Yes, sir.

Q. Where did you stand? A. Inside the counter.

Q. Where did he stand? A. He sat outside the counter.

Q. How far?   A. About twenty inches.

Q. Is not the counter more than twenty inches wide?
A. I don't think it is.

Q. At what did he write?   A. On the counter.

Q. The paper lying on the counter?   A. The receipt
book was lying on the counter.

Q. How high is your counter?   A. The ordinary
height of a dry goods counter.

Q. As high as this table?   A. Not quite so high.

Q. It was a receipt book?   A. Yes, sir.

Q. How large a book?   A. An ordinary receipt book;
you could put it in your pocket.

Q. Did the book lie flat on the counter or tipped up?
A. Flat on the counter.

Q. Do you remember how he made his signature; can
you describe any letters in his signature?   A. It was a
connection of letters; the capital letters were connected,
and the whole signature appeared to be connected.

Q. Is not the signature of most men connected?
A. Not always.

Q. But, as a general thing?   A. I think not, sir.

Q. Did you ever see the whole name " William " writ-
ten out?   A. No, sir; he signed it " Wm."

Q. Do you know, when he wrote the full name, how he
wrote it?   A. No, sir; I never saw him write it.

Q. He could not, in writing the full name, make that
peculiar connection of the " Wm. H."   A. No, sir.

*Re-direct.*

Q. Is there any considerable resemblance between this
handwriting (propounded will) and his?   A. I see not
any.

Richard A. Reading, re-called by proponents:

Q. What were your business connections with William
H. Merchant?   A. I was co-executor with him of his
father's estate.

Q. For how long?   A. Perhaps four years.

Q. Did you both act?   A. We both acted.

Q. Have you seen him write? A. Very frequently.

Q. How many times do you think you have seen him write? A. I don't know; perhaps fifty; perhaps one hundred times; very frequently.

Q. Have seen him write under different and distinct states of mind? A. Yes; under very different states of mind.

Q. What kind of papers have you seen him write; if more than one kind, state? A. I have seen him write letters; I have seen him write accounts; I have seen him write leases, and I don't know what else; I cannot designate them all; a variety of papers.

Q. Have you seen him write his name in full, "William H."? A. Yes, sir; I have seen him write it; I have never seen him sign it in full.

Q. How did he usually make his signature, with the initials, or in full? A. He usually made it "W. H. Merchant," or "Wm. H. Merchant;" that was his customary way of writing it, and I don't know that he ever did it differently from that; I don't know that I ever saw him do so.

Q. State if there is any fact before your mind, connected with it, at what time you saw him write, under excitement or agitation? A. I saw him once write under extreme agitation, so great that he could hardly stand, at least it was with difficulty that he could do so.

Q. Was his writing then of the same character, with his ordinary character? A. No, sir.

Q. You saw that signature yourself? A. I did.

Q. What was your opinion as to its passing?

[Objected to, and objection sustained.]

Q. Look at the will now propounded by Mrs. Cunningham, and state whether, in your opinion, it is his writing; you saw the will when it was taken from the box when it was clean; it is now very much mutilated? A. I have already testified about seeing it then.

Q. What is your opinion as to its being Merchant's

writing? A. I have seen so many good imitations that I never will swear positively to anybody's writing; but I had this will in my possession some two or three weeks, during which, I very frequently looked at it; never a doubt crossed my mind, but that it was his writing, his signature; I suppose the best testimony I can give about it is to say this: that had I received from him, in our business relations, any document written as this is, and signed as this is, I would have acted upon it, as from William H. Merchant; I will add, that he wrote at least two different styles of writing, which went into his signature as well as into the body of his writing; one was written with care, and the other in a more dash-off style, and he would carry these styles through an entire sheet of foolscap paper. I had this will in my possession for some time; I kept it until it was delivered here.

Q. Have you any doubts, from your own knowledge of Merchant's handwriting, about his signature being to that will; any doubts from your own knowledge, throwing out of view anything you may have heard outside? A. I cannot divest my mind of what I have heard outside, especially from the counsel on the other side, who have frequently communicated to me what they knew about it, and what they could prove.

Q. The counsel for the contestants? A. Yes, sir; I believe them to be honorable gentlemen, and they have made assertions to me about this, that certainly have had an influence on my mind.

Q. When you first looked at this will, when the box was opened, do you remember what you said about it?

[Objected to, and overruled.]

Proponent's counsel offer to show that when the box, which has been already alluded to in the testimony, was opened, this witness said that the writing of the propounded paper was that of Merchant.

Q. When you first saw this paper, what was your impression about it? A. That it was Merchant's writing.

William Dealing, called by proponents, testified:

Q. What is your business? A. My business latterly has been a house and real estate agent.

Q. Did you know William H. Merchant, in his lifetime? A. I did.

Q. How long did you know him prior to his death? A. As near as I can recollect, some three or four years.

Q. Did you ever see him write? A. I have.

Q. Are you familiar with his handwriting? A. Well, tolerably.

Q. (Handing propounded paper to witness.) Look at the paper now handed you, and state whether, in your opinion, the signature at the end of it is in the handwriting of William H. Merchant? A. I should judge it was, sir, according to the best of my judgment; I think that it is his handwriting.

Q. What as to the body of the paper? A. The body of the paper looks something like it; he wrote with a light hand; what I saw of his writing was pretty much after this style, though this is rather more of a round hand than his usual manner of writing. The latter part of this document looks more like his natural way of writing than the body of the instrument.

Q. How did he usually sign his signature? A. He usually signed his signature, not in full, "Wm.;" the "m" down on a line with the "W." The name here is very much as he was in the habit of writing it; and I should judge, according to the best of my judgment, that that was his writing.

Andrew Spence, called by the proponents, testified:

Q. Did you know William H. Merchant in his lifetime? A. Yes, sir.

Q. How long did you know him prior to his death? A. From five to eight years, I should think.

Q. Are you familiar with his handwriting? A. Yes, sir.

Q. Have you ever seen him write? A. Yes, sir.

Q. Seldom or frequently? A. Frequently.

Q. Look at the paper now shown you (the paper propounded as the will), and state whether the signature, in your opinion, is the signature of William H. Merchant? A. I should think it was.

Q. How as to the body of the will? A. I should think it was all in Mr. Merchant's handwriting.

Q. Were you in the habit of transacting business with Mr. Merchant in his lifetime? A. Yes, sir; up to 1860, or thereabouts.

Q. Did you ever see in his possession a tin box? A. Yes, sir.

Q. Look at the exhibited box, and say whether you have seen it in the possession of Mr. Merchant? A. I cannot tell whether that was Mr. Merchant's box or not; it looks very much like such a box as he had; he used to leave a box of that kind at my office.

Q. It is like the box he was in the habit of leaving at your office? A. Yes, sir.

Q. About the same size and general appearance? A. Yes, sir, as near as I can remember.

I ruled out the evidence of experts in handwriting, not themselves acquainted with the decedent's hand. I also refused, in accordance with what I believe to be the well-settled rule in this State, to admit papers into evidence in the case for the mere purpose of comparison. I confined the comparison of hands to the first will of Mr. Merchant, legitimately introduced into the case at the outset, and the two testamentary papers only have been compared. After carefully hearing the testimony on both sides in relation to handwriting, (refraining, meanwhile from making myself any examination of the two papers for the purpose of comparison, until the trial should be closed and the case summed up,) I then took them up, as a jury would do, and have carefully compared them. I have had some experience in the art of writing, and I

must say that the two papers seem to me remarkably similar in the style of hand. This resemblance increases under a microscope. As a juror, I could not find a verdict of guilty of forgery upon the face of these two papers; and, as a juror, I cannot say that the propounded paper is a forgery.

My conclusion is, then, to admit to probate the paper now offered, and to decree revocation of the probate of the earlier will. I arrive at this determination because, in my opinion, the evidence in favor of the later will must be held, upon the whole, to have predominated; and because, in such a case, it is my duty to be satisfied of its genuineness and validity.

Decree accordingly.